**Arthur R. BAITH**

v.

**Casper WEINBERGER, Secretary of Health, Education and Welfare.**

**Civ. A. No. 73–2007.**

United States District Court,
E. D. Pennsylvania.

June 27, 1974.

Robert F. Ruehl, Doylestown, Pa., for plaintiff.

Richard M. Meltzer, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

LUONGO, District Judge.

Arthur Baith (claimant) instituted this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision by the Secretary of Health, Education and Welfare concerning his application for disability benefits under §§ 216(i) and 223 of the Social Security Act, as amended. Claimant and the Secretary have filed motions for summary judgment.

On July 9, 1970, Baith, suffering from assorted ailments, most seriously pulmonary tuberculosis and silicosis, applied to the Social Security Administration for disability benefits. On December 9, he was notified that his claim had been rejected, and after request for reconsideration, the disallowance was reaffirmed by letter dated March 28, 1972. Claimant sought and was granted a hearing before an Administrative Law Judge in accordance with § 205(b) of the Social Security Act. The hearing took place on December 11, 1972, and, in a written opinion dated March 19, 1973, as amended March 27, 1973, the Administrative Law Judge concluded that claimant was "disabled," as defined by the Social Security Act from June 1970 to February 1972 and was entitled to receive disability benefits for the period from December 1970 to April 1972,[1] but that he was

no longer so disabled after February 1972. On July 16, 1973 the Appeals Council affirmed. This became the final decision of the Secretary. Claimant appealed by filing the instant suit.

In reviewing the Secretary's decision, the Court's role is narrowly circumscribed. The Secretary's decision must stand if it is supported by "substantial evidence." 42 U.S.C. § 405(g). "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). In deciding whether the Secretary's decision is supported by substantial evidence, the Court must look at the record as a whole. Vitek v. Finch, 438 F.2d 1157 (4th Cir. 1971); Blanks v. Richardson, 439 F.2d 1158 (5th Cir. 1971).

The test for disability is two-pronged: (1) a determination of the extent of the physical or mental impairment and (2) a determination whether that impairment results in an inability to engage in substantial gainful activity. Stancavage v. Celebrezze, 323 F.2d 373 (3d Cir. 1963); Janek v. Celebrezze, 336 F.2d 828 (3d Cir. 1964). There are four elements of proof to be considered in making a finding as to claimant's ability or inability to engage in any substantial activity: (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints and (4) claimant's age, educational background and work history. Dillon v. Celebrezze, 345 F.2d 753, 755 (4th Cir. 1965).

With these legal standards in mind, the record will be summarized. Baith, 57 years old at the time of the hearing, is now 59. He left school in the eighth grade. For most of his life (1933–1962) he was a coal miner, although he did not work in the mines from February 1957

---

1. There is a six month waiting period between the time when a claimant is adjudged to have become disabled and the time when he becomes eligible to receive disability benefits. He is then entitled to receive benefits until "the third month following the month in which his disability ceases." 42 U.S.C. § 423(a)(1)(D), (c)(2).

to April 1960 due to severe leg and back injuries. From 1960 to 1965 he was self-employed, at first part-time and then full-time, as a carpenter and painter. From 1965 to 1968 he was employed as a carpenter by a general contractor. From 1968 to 1970 he worked as a maintenance man for a metals company doing carpentry, plumbing and painting, as well as custodial work. (T 44–45; 155).[2] Except for a brief attempt at carpentry in 1971, he has not worked since 1970 because of the illnesses at issue in this case.

In May 1965, Baith was hospitalized briefly for heart and lung problems. (T 156). In 1967 he began paying regular visits to the State of New Jersey Hospital for Chest Diseases because he was tiring easily on exertion, feeling steady pressure across his chest, and coughing with increasing severity. (T 120). His respiratory problems at that time were undoubtedly caused by silicosis for which he began to receive black lung benefits in April 1970. (T 158). Around that time he also began to suffer from pain in most of his large joints and swelling of the ankles. (T 120). Although he continued working, his condition "deteriorated steadily." (T 120). By late 1969, Baith was suffering serious chest pains, fatigue and shortness of breath. In the first few months of 1970, he lost nearly 50 pounds while continuing to work as best he could. On June 2, 1970, a chest x-ray revealed changes in the right upper lobe area. Subsequently, a tuberculin test proved positive, and his ailment was diagnosed as pulmonary tuberculosis. He was an in-patient in the sanitorium from June 15, 1970 to August 13, 1970. At the time of his discharge, his x-ray showed slight clearing, his condition was somewhat improved, (T 114–115), and the discharging doctor, Mario Grosso, opined that Baith could return to full-time employment.

After a brief recuperative period at home, claimant attempted to return to work for the metals company in October 1970, first working two hour days and then half days. He was unable to do the required work and he was laid off in November 1970. (T 59).

From November 1970 through 1972, claimant was examined and treated by a series of doctors for his tuberculosis and other ailments, including a gastric ulcer, emphysema and an anxiety condition. Medical evidence and the diagnoses of the various physicians will be summarized chronologically.

On February 2, 1971, claimant was examined by Dr. John P. Galgon, who specializes in pulmonary diseases and pulmonary function testing. A chest x-ray revealed that Baith's heart and diaphragm appeared normal, but that significant infiltrative density was present in the right upper lung field and left apex. Dr. Galgon also observed that small rounded densities were present throughout the lung fields. In his view, these symptoms might have been from silicosis alone but could also represent active tuberculosis. (T 110).

On May 3, 1971, Dr. Peter Theodos reported on Baith's respiratory capacity from tests performed on April 23, 1971. He concluded that claimant's forced vital capacity was normal, but that forced expiratory volumes and maximum voluntary ventilation were moderately reduced, and there was a moderate degree of obstructive ventilatory impairment. (T 111).

On May 28, 1971, the New Jersey Hospital for Chest Diseases, where Baith was being examined regularly, reported on a series of checkups, the most recent of which had taken place on May 4, 1971. At that time, Baith's chest x-ray showed further clearing and his tuberculosis was diagnosed as inactive for five months. The report also noted that Baith had complained of chest pains and had on his own initiative discontinued PAS therapy because of gastric pain. (T 117)

2. Page references are to the administrative record.

Commencing February 1971, Baith saw his personal physician, Dr. Harold Shore, every six or seven weeks. On May 24, 1971, Dr. Shore expressed his opinion to the Social Security Board that claimant was unable to work because of tuberculosis and pneumoconiosis. (T 118). On the same day Dr. Vernon Erk of the Ridge Medical Center also concluded that claimant was unable to work continuously because of silocosis, tuberculosis and related complaints including bronchial spasms and neuritis. (T 119).

On July 22, 1971, Dr. Stephen A. Gabor examined Baith for the Commonwealth of Pennsylvania. From his observations of Baith's chest and respiratory ailments, Dr. Gabor noted that chest expansion was poor, and the upper half of the right chest was severely impaired in resonance while the left was only slightly impaired. Expiration was prolonged in the right upper lobe, and the breath sounded weak and distant at both bases. Throughout the right upper lobe the breath was harsh and numerous varieties of rales were heard—shrill, moist and wheezing.

In regard to Baith's other ailments, Dr. Gabor reported no changes in the large painful joints, and noted a slight ankle edema and clubbing, or stiffening, of the fingers. He concluded overall that the tuberculosis was well-controlled and that with constant therapy claimant could "soon" undertake some sedentary occupation, although he could never return to carpentry. (T 120). Dr. Gabor also noted that Baith had regained nearly all of the weight lost in 1970.

On February 18, 1972, Dr. Gabor reexamined Baith and concluded that the pulmonary tuberculosis condition had improved. The signs of rales were fewer and no signs of cavitation were found. Chest expansion was still moderately impaired, but emphysema at the bases seemed the same. The exercise phase of the "Master's Two Step" test revealed little discomfort and only slight

ankle edema showed. Dr. Gabor noted that Baith's subjective complaints were severe. Claimant described his condition as "worse," saying that he could not walk more than $\frac{1}{4}$ mile or climb more than four steps without severe dyspnea or weakness and that he coughed up about three ounces of sputum in the morning and in the evening. He also told Dr. Gabor that his joints were stiffer and he had continuous dull chest pains. Dr. Gabor concluded that the coughing up of sputum, if true, should make Baith sicker than he was, and that "a trial of a sedentary occupation would be worthwhile." (T 134).

On October 5, 1972, Dr. Shore wrote that he was treating claimant for a gastric ulcer, respiratory difficulty, anxiety state, and arthritis. He detailed the medication Baith was taking for each ailment. Dr. Shore stated that although he was not actively treating the tuberculosis, he was in communication with the New Jersey Hospital for Chest Diseases and, based on their reports pertaining to the tuberculosis, Dr. Shore concluded Baith could not "do any work requiring physical activity. I cannot see any improvement taking place in the foreseeable future which would allow this man to work." (T 149–150).

On October 18, 1972, the New Jersey Hospital for Chest Diseases submitted its last report based on its examination of October 17. Chest x-ray revealed no change as compared with July 18, 1972. Forced expiratory spirogram showed Baith's vital capacity was 100% of predicted, and his one second expiratory volume was 60% of vital capacity. (T 154).

The final piece of medical evidence was a letter submitted by Dr. Shore on April 21, 1973. Dr. Shore stated his conclusion that Baith was completely and permanently disabled. He summarized the chest and respiratory ailments, and noted the severe dyspnea on less than ordinary exertion and the need to lie down three or four times daily. Dr.

Shore also reported that Baith did not sleep well. (T 161). This letter was submitted after the decision by the Administrative Law Judge, but it was considered by the Appeals Council, (T 5), and is therefore treated as part of the record. *Accord,* DePaepe v. Richardson, 464 F.2d 92, 100 n.2 (5th Cir. 1972).

At the hearing, Baith testified that his activity since 1970 has consisted of caring for his pet dogs, raising chickens, doing limited household chores, and lying down to rest three or four times a day. (T 47–49). He testified further that he sleeps only 2½ to 3 hours a night because of his inability to breathe in a prone position, and that he must leave bed nightly to cough up phlegm. (T 154). He said he has been taking much medication, 400 mg of Isoniazid daily as well as other assorted pills to alleviate pains in his chest and head (T 51), and for anxiety and ulcer. Notwithstanding all the medication, he stated that his "chest always hurts, just like somebody's sitting on it all of the time." (T 51). He also testified that during the seven minute walk from the train station to the Administrative Law Judge's office, the weakness in his hip and shortness of breath required him to stop several times. (T 60–61).

There was testimony by vocational expert Dr. Morris Rubin, a counselling psychologist, as to the type of substantial gainful employment which exists in the national economy for a person in claimant's condition. The Administrative Law Judge restricted the vocational expert to the physical findings of Dr. Gabor's second report and asked whether a person so described could be gainfully employed. (T 64). Dr. Rubin expressed the opinion that, given those assumptions and claimant's age, education and occupational history, he could perform various bench assembling and inspecting jobs in manufacturing, work as a retail sales clerk in hardware, lumber or paint departments, or serve as an estimator for building contractors, (T 65),

and that such jobs were numerous in the Philadelphia area. Dr. Rubin did not change his opinion when asked to add to the assumptions Baith's complaints of gastric ulcer, nervous condition, headaches and the New Jersey Chest Clinic report of October 17, 1972. Dr. Rubin described all the jobs as sedentary to moderate and testified that such jobs would not overtax claimant's condition. (T 67). However, when there was added the assumption that Baith slept only 2½ to 3 hours a night, Rubin concluded he would have "difficulty performing productive responsibilities in any kind of work situation on a sustained competitive basis." (T 67–68). The vocational expert also acknowledged that if the clubbing of the fingers was severe, claimant would be precluded from bench assembly work, but if the clubbing were mild, bench assembly work might prove therapeutic. (T 71). He also stated that the shortness of breath could conceivably have an adverse effect on Baith's ability to work, but given the ventilation and cleanliness of most places of employment, it would not ordinarily be a drawback. (T 74).

Following the vocational expert's testimony, and in response thereto, Baith testified that he had never worked in a retail store; that he had worked only as a laborer; and that even when he was self-employed as a carpenter, he could do the job only if it was laid out for him or if the lumber company told him what he needed. (T 78).

### DISCUSSION

On this record, the Appeals Council upheld the Administrative Law Judge's decision that Baith was disabled prior to February 1972, but not thereafter. While resolving conflicts in the evidence is the responsibility of the Secretary, it is the Court's function to decide whether the Secretary's determination is supported by substantial evidence in light of the record as a whole. " 'Substantial' means just that and is not the

equivalent of a 'scintilla.'" Hess v. Secretary of H.E.W., 497 F.2d 837, at 838 (3d Cir. 1974); Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir.), cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). The Court must also review the Secretary's decision for possible errors in application of the relevant legal standards.

That claimant has tuberculosis is undisputed. Because of that condition, the Administrative Law Judge concluded that he was "disabled" from June 1970 to February 1972, but the record supports the conclusion that Baith's tuberculosis improved substantially after the first year. By May 1971, the New Jersey Hospital for Chest Diseases, which followed his condition constantly from the onset of the disease, noted that Baith's tuberculosis had been inactive for five months. Examining claimant for the first time in July 1971, Dr. Gabor observed that his tuberculosis was "well-controlled." He noted further improvement in reporting the examination of February 18, 1972. Social Security regulations provide:

"Pulmonary tuberculosis is a communicable disease and disability is determined primarily on the basis of activity of the disease. Individuals with 'inactive' or 'quiescent' disease are not considered to be under a disability on the basis of tuberculosis, whereas individuals with 'active' tuberculosis are considered to be under a disability."

20 CFR Subpart P, Appendix 3.00B In light of this standard, the Secretary's finding that the tuberculosis had ceased to be disabling by February 1972 seems amply supported.

In addition to the tuberculosis, Baith has also complained of several other ailments, including a gastric ulcer, emphysema, anxiety condition and cataracts. The Administrative Law Judge considered these ailments, singly and in combination, and concluded that they were not disabling. This conclusion also received adequate support from the medical record.

With respect to the ulcer, Dr. Gabor adopted the conclusion of Baith's personal physician that it was caused by the medication claimant took for his tuberculosis and observed that it was "much better" due to a lowering of the dosage. The ulcer was one of the factors Dr. Gabor considered when he reached the conclusion that Baith was physically capable of trying a sedentary occupation. The vocational expert also took account of the ulcer in concluding that Baith could work on a sustained basis. While his gastric condition is undoubtedly a source of discomfort, there is no reason to believe it is disabling.

Baith's emphysema undoubtedly produces some impairment of his breathing, but the reports of Dr. Theodos (T 111), Dr. Gabor (T 120; 134) and the New Jersey Hospital for Chest Diseases (T 154) furnish support for the conclusion that the impairment was moderate. Dr. Gabor's two reports clearly suggest a substantial improvement in respiratory capacity between July 1971 and February 1972, which contributed to Dr. Gabor's conclusion that Baith was ready to work. Additionally, the vocational expert testified that Baith's shortness of breath would have some effect, but not much, on his ability to perform a sedentary job, in view of the ventilation and cleanliness of most work places. (T 73–74).

Baith submitted very little medical evidence in connection with his anxiety condition. The record includes a reference that he consulted with a psychiatrist, Dr. Frank Magro, (T 109), but there is no additional report of Dr. Magro's course of treatment or diagnosis. Dr. Shore noted that Baith suffered from anxiety neurosis for which he was receiving medication. (T 148). Claimant has the burden of proving disability under the Social Security Act, Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970); Celebrezze v. Sutton, 338 F.2d 417 (5th Cir. 1964); Adams v. Flemming, 276 F.2d 901 (2d Cir. 1960), and

he produced no evidence that his anxiety was acute enough to be disabling.

Baith's cataracts also received only passing mention. Claimant testified that in seeking a cure for his headaches, he had consulted an ophthalmologist, Dr. Morrison, who told him he had cataracts, evidently in an early, minor state. According to Baith, the cataracts make it difficult for him to focus his eyes while reading. (T 56–57). There was no medical evidence in the record pertaining to the cataracts, and the Secretary's conclusion that they were not disabling seems unobjectionable.

The Secretary concluded that Baith was capable of working at various bench assembly jobs, as a retail clerk in lumber, paint or hardware departments, or as an estimator for building contractors. These conclusions were based on the vocational expert's testimony that claimant was suited by experience for these jobs and was physically able to perform them. The conclusion that Baith could work as an estimator did not seem to be adequately supported on the record. The vocational expert based his finding on Baith's experience as a carpenter, but claimant testified that even when self-employed as a carpenter, he could do the jobs only if the exact task required was laid out and the lumber company told him what was needed by way of supplies. Claimant completed the eighth grade and can add, subtract, multiply and divide, but he claims to lack familiarity with what materials would be needed for particular jobs and their costs. However, beyond this, the vocational expert's testimony provides strong support for the Secretary's conclusion. Baith's physical condition was described to Rubin in great detail, including claimant's ulcer, anxiety, headaches and shortness of breath, and Rubin's conclusions reflected his expert knowledge about job requirements and work environments. The Secretary's finding that Baith could perform bench assembly tasks or serve as a retail clerk in certain departments is adequately supported on this record.

The only difficult legal question in this case is whether the Secretary gave proper consideration to claimant's subjective complaints. The Social Security Act and its implementing regulations concerning disability "require a subjective determination of the claimed disability. Symptoms which are real to the claimant, *although unaccompanied by objective medical data, may support a claim for disability benefits, providing [claimant] satisfies the requisite burden of proof*." Bittel v. Richardson, 441 F. 2d 1193, 1195 (3d Cir. 1971) (emphasis added). Of course, where subjective symptoms such as pain or discomfort are involved, the possibility of fabrication or exaggeration by claimants cannot be overlooked. For this reason, complaints of pain and suffering, unsubstantiated by medical evidence or grossly disproportionate to medically ascertainable symptoms or ailments, will not support a claim for disability benefits. Calpin v. Finch, 316 F.Supp. 17 (W.D. Pa.1970). Subjective complaints, while relevant, must "be evaluated by the finder of fact in light of the other evidence that may bear on the claimant's physical status." Anderson v. Richardson, 352 F.Supp. 1203, 1205 (E.D.Pa.1972). Where subjective complaints dovetail with medical data and opinion, they can be instrumental in supporting a claim for disability benefits. *See, e. g.,* Ber v. Celebrezze, 332 F.2d 293 (2d Cir. 1964); DePaepe v. Richardson, 464 F.2d 92 (5th Cir. 1972); Santiago v. Richardson, 345 F.Supp. 438 (E.D.Pa.1972); Plouse v. Richardson, 334 F.Supp. 1086 (W.D.Pa. 1971); Powell v. Richardson, 355 F. Supp. 359 (E.D.Pa.1973).

There is little doubt that if Baith's subjective complaints were accepted as true, he would be disabled within the meaning of the Social Security Act. If it is true that he must lie down several times a day due to fatigue and shortness of breath, it is unlikely that he can hold a full-time job. The vocational expert testified that if the claimant is unable to sleep more than two and a half to

three hours a night, as Baith testified, he would not be able to hold a job.

In concluding that Baith was not disabled, the Administrative Law Judge either disbelieved claimant's subjective complaints, or failed to consider them. Under the law it is his prerogative to disbelieve Baith so long as his conclusion is supported by sufficient evidence, but if he did not consider claimant's subjective complaints, he committed an error of law.

During the course of his opinion, the Administrative Law Judge never explicitly stated that he disbelieved Baith. However, he did summarize Baith's subjective complaints at length. (T 14). Moreover, at one point he wrote:

"If it is accepted that claimant only gets two and a half to three hours of sleep per night and is required to be up and about as he testified, then the Vocational Expert did not believe any work existed which claimant could perform on a sustained competitive basis." (T 18)

From this statement, it might be inferred that the Administrative Law Judge took account of Baith's complaints and disbelieved them, or (what is far less likely) that he believed Baith, but rejected the vocational expert's opinion. I am unwilling to deal in inference or speculation on an issue which is so central to Baith's claim, particularly where there is no obvious basis in the record for disbelieving his testimony. The Third Circuit has recently confirmed, although by way of dictum, that "it is incumbent upon the examiner to make specific findings—the court may not speculate as to his findings." Baerga v. Richardson, 500 F.2d 309 at 312 (3d Cir. 1974); accord, Choratch v. Finch, 438 F.2d 342, 343 (3d Cir. 1971). Much of the court's concern in Baerga was di-

rected at the Hearing Examiner's [3] treatment of the claimant's subjective complaints. On this point, the court wrote:

"Furthermore, [the Hearing Examiner] did nor address himself to the testimony of plaintiff and his wife concerning plaintiff's pain, his alleged inability to dress himself or bathe, his limitations on sitting, standing, and walking, as well as other restrictions caused by his extensive hip and leg deformities. As fact finder he has the right to reject their testimony entirely, but failure to indicate rejection could lead to a conclusion that he neglected to consider it at all." Baerga, supra, 500 F.2d at 312.

Specific findings with respect to claimant's subjective complaints are particularly needed in this case where "the record includes medical data which would not contradict, indeed, would support [Baith's] complaints . . . ." Baerga, supra. Dr. Gabor noted that claimant suffered "occasional mild orthopenea," i. e., inability to sleep in a prone position (T 134), lending some support to Baith's complaint of inability to sleep more than two and a half to three hours a night. Every physical examination, including those since February 1972, showed some impairment in claimant's ability to breathe. His sedentary daily regimen reinforces the contention that he needs frequent rest. Compare Calpin v. Finch, supra, Marek v. Finch, 315 F.Supp. 1029 (N.D.Ill. 1970).

In view of the importance of the issue and the ambiguity surrounding it, the record will be remanded to the Secretary for specific findings with respect to Baith's subjective complaints, particularly his professed inability to sleep.

---

3. "Hearing Examiner" is the former title for the position now designated as "Administrative Law Judge."