**Michael T. JONES**

v.

**Patricia Roberts HARRIS, Secretary of Health, Education and Welfare.**

Civ. A. No. 79–4474.

United States District Court,
E. D. Pennsylvania.

July 7, 1980.

**162**

Carl Soifer, Philadelphia, Pa., for plaintiff.

William McGettigan, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

This action was brought under Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare denying the plaintiff a period of disability and disability insurance benefits under Section 216(i) and 223, respectively, of the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423. This matter is before us on cross motions of the parties for summary judgment. For the reasons to follow, we grant plaintiff's motion for summary judgment.

## MEDICAL HISTORY

That plaintiff had an accident is undisputed. The record indicates that while at work on June 25, 1974, plaintiff was injured when he was hit on the neck and head by a falling heavy metal bar (Tr. 68, 132). Plaintiff was brought in a dazed, semi–conscious condition, to Methodist Hospital in Philadelphia, Pennsylvania (Tr. 68, 132). X–rays of the cervical spine and skull taken at Methodist were normal and plaintiff was discharged (Tr. 132, 228–29). Plaintiff returned to Methodist on June 30, 1974, complaining of terrible headaches. The diagnosis was muscle sprain (Tr. 231).

The plaintiff continued to suffer from pain and headaches (Tr. 69, 141). Over the next several weeks he was treated as an outpatient with various analgesics and muscle spasm relaxors, as well as with a plastic collar and home cervical traction (Tr. 132, 232). He did not respond adequately to this treatment, and was admitted to Mercy Catholic Medical Center in Philadelphia on September 23, 1974 for more intensive therapy (Tr. 132). A neurological examination revealed significant reduction in range of movement of his neck with prominent spasm and guarding of both trapezius muscles. The other paraspinal cervical muscles were also somewhat tender and tight (Tr. 132). Physical therapy with heat and traction was administered, and plaintiff was given fairly heavy doses of muscle spasm

relaxing drugs, as well as analgesics (Tr. 132). Plaintiff was discharged on October 12, 1974, at which time he was taking Triavil, Valium, and Codeine (Tr. 132). Plaintiff was instructed to continue with his collar and home traction, and to return for further outpatient follow–up (Tr. 133). The final diagnosis by Dr. Lorenzo Runk, a Board certified specialist in neurology (Tr. 220), was: (1) acute and chronic cervical muscle spasm, traumatic; (2) cerebral concussion; (3) post–concussion cephalgia. Plaintiff periodically returned to see Dr. Runk (Tr. 133).

Still suffering from pain in the neck, shoulder, and left arm, plaintiff was examined on December 16, 1974 by Dr. Raymond O. Stein, a Board certified specialist in orthopedic surgery (Tr. 213), who concluded that "he does not seem to be any better" (Tr. 141). Neck and cervical spine studies taken on December 16, 1974 by Dr. Irving B. Wexlar, and Dr. Arnold H. Levine showed a marginal irregularity along the fifth cervical segment (Tr. 140). Dr. Stein again examined plaintiff on December 23, 1974, and stated in his report that "the x–ray pictures did show a chip fracture and it may be that he has some residual from this, it is only six months and this is not a long time, for a neck injury" (Tr. 143). Dr. Stein further stated that plaintiff was suffering from radicular pain in relationship to a soft tissue injury and "probably" discogenic damage at C–5 and C–6 cervical discs (Tr. 145). Dr. Stein continued to treat plaintiff. His reports indicate that over the next few months plaintiff continued to suffer from residual pain, but that he did experience some improvement (Tr. 146–152).

After the accident, plaintiff remained out of work until March 17, 1975, with the exception of a period described by the plaintiff as between three weeks and two months, during which time he did work (Tr. 100–102). Plaintiff returned to work on March 17, 1975, and continued working until November 12, 1975, missing 18 to 20 days during that period (Tr. 115).

X–rays taken by Dr. Wexlar and Dr. Levine on June 6, 1975, revealed a marginal defect along the antero–inferior aspect of the fifth cervical segment, associated with triangular ossification. Their report noted that "this appearance is compatible with the residual of an avulsion fracture at this site" (Tr. 153–54). Dr. Stein's examination of plaintiff on June 13, 1975 noted that the x–rays showed the avulsion fracture at C–5 and C–6, and that plaintiff was still having difficulty with his neck and pain in the area of his left shoulder and arm. Dr. Stein concluded that plaintiff "has not improved" (Tr. 155).

Dr. Stein's reports over the next several months indicate that plaintiff showed a little improvement (Tr. 157–59), although the possibility of more drastic treatment, in the nature of a fusion was mentioned by Dr. Stein in his reports as early as March 27, 1975 (Tr. 151). These reports indicate that plaintiff first began to consider surgery on June 6, 1975 (Tr. 155), but that he had a religious principle against a transfusion, and Dr. Stein would not be willing to undertake the operation unless plaintiff gave permission for use of transfusions if necessary (Tr. 156). Plaintiff visited Dr. Stein again on October 24, 1975 after experiencing a severe flare–up of pain beginning three days earlier and which had not quieted down (Tr. 160). By November 14, 1975, plaintiff had definitely decided to have surgery performed (Tr. 162), but was advised that Dr. Stein would be unable to perform it until the middle of January (Tr. 162, 163).

On December 1, 1975, plaintiff was admitted to the Hospital of the University of Pennsylvania in Philadelphia, with a diagnosis of C5–C6 cervical disc disease (Tr. 164). X–rays showed a small fragment along the lower anterior border of the fifth cervical vertebrae probably representing a traumatized osteophyte or an unfused ossification center (Tr. 164–65). A myelogram was performed and was within normal limits (Tr. 165, 168). Plaintiff was discharged on December 9, 1975. An x–ray report done by Dr. Paul S. Friedman on March 4, 1976 showed "reduction in cervical lordosis in the neutral position, such as accompanies

cervical muscle spasm", and also an old fracture of the anterior inferior portion of the body of the fifth cervical vertebra (Tr. 169–70).

On December 1, 1976, plaintiff consulted Dr. Joseph M. Waltz of the Department of Neurologic Surgery of St. Barnabas Hospital, Bronx, New York, complaining of almost constant pain in his neck and left shoulder for the past two and a half years (Tr. 171). The diagnosis was possible degenerative disc C5, C6 (Tr. 180). Plaintiff was admitted to St. Barnabas on January 20, 1977 (Tr. 181). The hospital report noted that he had suffered from an almost constant pain in the cervical area on the left side with radiation onto the left shoulder, and from an occasional heavy feeling or ache in the left hand (Tr. 181). The report further states that plaintiff's left hand tired easily and that plaintiff did not use it as much as he had previously (Tr. 181). There was tenderness in the cervical area over C5 and C6, and definite increase in the pain in the neck with hyperextension or rotation of the head and neck (Tr. 181). An x–ray showed an old teardrop fracture of the lip of C5, and there was mild cervical spondylosis in the region of C5 and C6 (Tr. 181, 243). Electromyography revealed a C6 root problem on the left side, and a cervical analgesic discography was done, which relieved the cervical pain and allowed plaintiff to hyperextend and rotate his head without discomfort (Tr. 181). Based on this an anterior cervical fusion was performed by Dr. Waltz on February 4, 1977 (Tr. 181, 235). There was found to be a "transverse fracture of the lip of C5 which came away quite easily and encompassed the whole anterior lip" (Tr. 235). "The disc was quite degenerative and was removed easily (Tr. 235).

Plaintiff filed an Application for Disability Insurance Benefits with the Social Security Administration on March 15, 1977 (Tr. 184–97), claiming that he became unable to work because of his disability on November 13, 1975. Plaintiff asserted that he couldn't do any "lifting, pushing, talking too much", could do "nothing to exert myself", and that he tried to do the same things he used to, but could not do as much and tired easily (Tr. 190). Plaintiff further stated that he was in pain constantly, was gradually learning to turn his neck, and had limited arm and shoulder movement (Tr. 193). The Social Security Administration found plaintiff to be not disabled, and denied his claim for disability benefits on April 12, 1977 (Tr. 201–202). A denial notice was sent to plaintiff on April 26, 1977 (Tr. 203–204) and on June 7, 1977 plaintiff filed a Request for Reconsideration (Tr. 205).

Plaintiff was examined on August 26, 1977, by Dr. Gad G. Guttmann, who noted that there was some improvement in plaintiff's condition, but that plaintiff continued to suffer from occipital temporal headaches, occasional flushes, some pulling sensation along the base of the neck and left shoulder, and some residual stiffness of his neck (Tr. 206). Dr. Guttmann concluded that at that time plaintiff was "disabled from performing the type of work he has done in the past", but that with "further rehabilitation and recuperation . . . [he] should be able to return to his previous work, provided he receives the proper physical therapy, observation and treatment" (Tr. 207). Dr. Guttmann also felt that plaintiff "should be re–evaluated in about six months to see how much he has progressed" (Tr. 207).

Upon reconsideration by the Social Security Administration, plaintiff's claim was again denied on August 30, 1977 (Tr. 209–210). The disability examiner determined that medical evidence did not meet or equal social security disability requirements, and that the plaintiff "had the capacity to engage in numerous light/sedentary jobs, such as car–rental clerk (Auto Ser) assignment clerk (Motor Trans) or grader, meat (Slaughter and Meat Pack)" (Tr. 210). Plaintiff filed a Request for Rehearing on September 14, 1977 (Tr. 215).

Plaintiff was examined again by Dr. Waltz on December 7, 1977, "complaining of discomfort and pain in the left paraspinous area at the cervical dorsal junction, involving the muscles here as well as the trapezius" (Tr. 217). Dr. Waltz further noted that

"there seems to be underlying trigger points", and recommended professional massage by an expert masseuse (Tr. 217). Plaintiff was to return for local treatment of the trigger points by means of injection or freezing if the massage was not successful in relieving his complaint (Tr. 217). Dr. Waltz re–evaluated plaintiff again on March 3, 1978 and determined that there were eleven separate painful trigger points, so that cryomyoneurolysis would not be effective (Tr. 225). An x–ray of plaintiff was taken on March 17, 1978, by Dr. Wexlar and Dr. Levine. Flexion and extension studies revealed a complete restriction of motion between the surgically fused fifth and sixth cervical segment (Tr. 226). A report by Dr. Stein on March 30, 1978, stated that plaintiff had pain and limitation of motion in the cervical spine and also had a "cervical nerve root compression as evidenced by appropriate radicular distribution of sensory, motor, and reflex abnormalities" (Tr. 227).

A hearing on plaintiff's disability claim was held on March 31, 1978 before Administrative Law Judge Wanda P. Chocallo. Plaintiff was represented by counsel (Tr. 37–129). The record was held open after the hearing for submission of additional medical documentation, which was not received until November, 1978 (Tr. 20).

A deposition of Dr. Waltz was taken on August 17, 1978 (Tr. 253–71). Dr. Waltz, in considering the effect of plaintiff's condition on his ability to do physical labor stated that plaintiff did not have any weakness or paralysis, but did have accentuated pain which increased with activities: "movement, the upper extremities, his shoulder girder, head and neck constantly" (Tr. 259–60). Dr. Waltz further stated: "[a]lmost any normal activity that requires any use of the upper extremity in head and neck would increase the pain. Physically speaking, he could do work, but practically so far as pain is concerned I would have to say no, because it is causing him pain" (Tr. 260). Dr. Waltz stated that the fusion seemed to have relieved the head and neck pain and the pain was "primarily down in the shoulder girder and . . . muscles" (Tr. 261). He was also unable to explain why plaintiff appeared well–muscled and well–toned or whether that was inconsistent with plaintiff's pain (Tr. 268–69). Dr. Waltz concluded that plaintiff was not faking or malingering but was legitimately and genuinely suffering from the pain complained of by him (Tr. 263–64, 267). Dr. Waltz explained that this conclusion was based on his finding of pain trigger points, which patients who are malingering are unable to correctly identify from one occasion to the next (Tr. 263–64), and on his knowledge of plaintiff: "I think I know Mr. Jones pretty well. I think he is well motivated. I think he wants to get back to work. I think he's very well motivated. I don't think he wants to be crippled" (Tr. 264).

Plaintiff was re–admitted to St. Barnabas on December 4, 1978, for treatment of painful trigger points of the left trapezius and left paraspinous muscles (Tr. 288). Plaintiff underwent cryomyoneurolysis on December 6, 1978, during which four painful spots were isolated (Tr. 288, 290) and again on December 13, 1978, during which three additional painful spots were isolated (Tr. 288, 289). Plaintiff was discharged on December 21, 1978, with a discharge diagnosis of painful muscle trigger points, fascial myositis localized to trapezius and paraspinal muscles (Tr. 288).

Plaintiff was referred by Dr. Stein to Orner Associates, Physical Therapy, and received treatment of electrical stimulation, heat, and massage from April 20, to April 25, 1979 (Tr. 293).

By decision of February 23, 1979, the Administrative Law Judge found that plaintiff was not entitled to a period of disability or to disability benefits (Tr. 19–32). Plaintiff filed a request for review of the hearing decision. On October 16, 1979, the Appeals Council of the Social Security Administration concluded that there was no basis for granting the request for review (Tr. 5–7). "Accordingly, the hearing decision denying disability stands as the final decision of the Secretary in . . . [this] case" (Tr. 5).

Plaintiff has submitted to the court a letter, dated April 14, 1980, from Dr. Stein, stating that Pantopaque, the dye used in myleograms, has been trapped in plaintiff's cervical spine and that can be irritating the area. Dr. Stein further states that plaintiff "has not been recovered sufficiently to be able to return to work certainly from the date of the operation down to and including the present time" (Exhibit A attached to plaintiff's Motion and Supporting Brief for Summary Judgment).

## VOCATIONAL INFORMATION

Plaintiff was born on May 7, 1950, and has a high school education. At the time the injury occurred plaintiff worked as a meat packer for Bluebird Food Products Co. in Philadelphia (Tr. 51, 282). Bluebird's records show that plaintiff was originally hired in October, 1970, and was terminated on July 2, 1976, as he was not physically able to work (Tr. 282). Prior to this he had worked as an automobile repairman (Tr. 285) and as a professional boxer (Tr. 60–61). Plaintiff was absent from Bluebird a total of 114 days in 1974, 98 days in 1975, and 141 days in 1976 (Tr. 282). Plaintiff's job consisted of lifting 50 and 75 pound slabs of meat off of conveyor belts and into boxes (Tr. 51–52). After the accident he returned to work on March 17, 1975, until November 12, 1975 (Tr. 100), during which time he was given light duties to perform, although he did do some lifting (Tr. 105–107). The light duty consisted of scale work, which involved no lifting (Tr. 107). Plaintiff had to stand still and weigh meat which others lifted onto the scale (Tr. 107). Plaintiff left work in November, 1975 because "The pain got so bad I couldn't even do the light work." (Tr. 108).

Plaintiff again attempted to return to work in the latter part of 1976, this time with an inventory research company identified by him as Intersearch, located in Jenkintown, Pennsylvania (Tr. 56). Plaintiff's work consisted of sitting at a desk, making telephone calls (Tr. 56, 113). Plaintiff was fired after three weeks because he was unable to do the job (Tr. 56–60, 113–14).

He experienced headaches, and pain in the neck, left side, and back (Tr. 114).

At the hearing before the Administrative Law Judge on March 31, 1978, plaintiff testified that because of tiredness, aches and pains in his neck, side and back, the furthest distance he is able to walk is four or five blocks (Tr. 92), and the longest period he can stand is for approximately fifteen minutes (Tr. 93). Plaintiff also has problems sitting as he suffers from tightness and pain in the neck, left side of the shoulder blade and left side near the spine (Tr. 93–94). The length of time for which plaintiff can sit before this occurs varies from five to ten or twenty minutes (Tr. 94). Plaintiff has difficulty bending and stooping and going up and down stairs, and the pain "gets very unbearable" (Tr. 96–97).

A vocational report on plaintiff was prepared by Mr. Bernard Orr on April 18, 1979 (Tr. 284–87). Mr. Orr interviewed plaintiff on January 29, 1979, and reviewed plaintiff's medical record (Tr. 284). During the interview plaintiff described the pain in his neck, left shoulder and back as "feeling like a 'knife was cutting' " (Tr. 285). The pain can attack anytime during day or night and can occur twice in one day (Tr. 285). Plaintiff must take medication (Percodan, Valium, or Codeine), and get into bed (Tr. 285). The pain is unbearable until he falls asleep for two or three hours; when he awakens the pain is still there, but not so severe as to prevent him from sitting up (Tr. 285).

As a result of his vocational evaluation Mr. Orr concluded that "Mr. Jones remains completely and totally incapable of sustained job effort. If he should conceal his condition and manage to get himself hired, he would not last two days, even on the easiest sedentary job. Once the pain attacked him he would have to go home, take the medication, lie down, apply heat and try to sleep. Mr. Jones is now totally unemployable in any job whatsoever." (Tr. 286–87).

## JUDICIAL REVIEW

Title 42 U.S.C. § 405(g) provides that "the findings of the Secretary as to any fact, if

supported by substantial evidence, shall be conclusive." Consequently, in a suit for judicial review of a final decision by the Secretary, the sole question for the Court is whether the finding of the Secretary that the plaintiff was not entitled to receive disability insurance benefits is supported by substantial evidence. Substantial evidence is such relevant "evidence which a reasoning mind would accept as sufficient to support a conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance of the evidence." *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3rd Cir.), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

After careful review of the record, we find that the Secretary's decision that plaintiff is not entitled to a period of disability or disability insurance benefits is not supported by substantial evidence.

In order to establish a disability within the meaning of the Social Security Act, a claimant must prove, first, that he has a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months, and, second, that the impairment renders him unable to engage in substantial gainful activity. 42 U.S.C. §§ 416(i)(1) and 423(d)(1). *Hargenrader v. Califano*, 575 F.2d 434 (3rd Cir. 1978). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work". 42 U.S.C. § 423(d)(2)(A). A claimant has the initial burden of proving that due to his disability he is unable to perform his former work. *Brooks v. Califano*, 440 F.Supp. 1341, 1343 (D.Del.1977). Once the claimant has estab-

lished his inability to perform his former work, the burden shifts to the Secretary to show that the claimant is capable of performing alternate gainful employment. Id.

█ In determining whether a person is able to engage in any substantial gainful activity, there are four elements of proof which the Secretary must consider: (1) objective medical data and findings; (2) expert medical opinions; (3) subjective complaints; and (4) claimant's age, educational background and work history. *De Paepe v. Richardson*, 464 F.2d 92 (5th Cir. 1972); *Davila v. Weinberger*, 408 F.Supp. 738, 741 (E.D.Pa.1976); *Barats v. Weinberger*, 383 F.Supp. 276, 282–83 (E.D.Pa.1974).

After reviewing the medical evidence and the testimony, the Administrative Law Judge found that plaintiff's subjective symptomology was not supported by clinical findings or laboratory data; that substantial medical documentation of record established that plaintiff had no significant physical abnormalities or functional limitations; and that plaintiff's assertions of disabling pain were not credible. The Administrative Law Judge concluded that plaintiff was not precluded from returning to his previous work, and denied his claim (Tr. 19–32).

█ There is no dispute in the record as regards the objective medical data and findings of the doctors who treated and examined plaintiff. It is indisputable that plaintiff suffered a severe injury resulting in discogenic disease and that a cervical fusion of the C–5 and C–6 vertebra was performed on him. However, this in itself does not establish plaintiff's disability. The salient factor in this case is plaintiff's subjective complaint of pain. It is this pain, which plaintiff asserts to be unbearable, that is disabling. The Administrative Law Judge chose to disbelieve plaintiff. A thorough review of the record clearly shows this finding to be unsupportable.

It is quite true that pain, because it is experienced only by the person suffering from it, does not easily lend itself to objective evaluation. Yet, "even pain unaccompanied by objectively observable symptoms

which is nevertheless real to the sufferer and so intense as to be disabling will support a claim for disability benefits". *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3rd Cir. 1971); *Ber v. Celebrezze*, 332 F.2d 293, 299 (2nd Cir. 1964). Of course, the possibility of fabrication or exaggeration cannot be overlooked. *Baith v. Weinberger*, 378 F.Supp. 596, 603 (E.D.Pa.1974).

Thus, the Administrative Law Judge was quite properly concerned, as her written opinion demonstrates, with the possibility of fabrication or exaggeration by plaintiff and the potential for abuse which would result if every claimant alleging pain was to be awarded benefits. Nevertheless, such concern with the integrity of the disability benefit system must not blind the Social Security Administration or the courts which review its decisions to the merits of the individual case before them at a particular time.

This court finds the plaintiff's assertions of pain credible. Moreover, the existence of this disabling pain is amply corroborated in the record by the entirely credible and unbiased medical judgments of all of the doctors who treated and examined plaintiff. The expert medical opinions of Drs. Stein, Waltz, and Guttmann attest to the pain from which plaintiff has suffered since he was injured in 1974, and from which he continues to suffer at present. Nothing in the record indicates that plaintiff has fabricated his reports of pain or that he is faking or malingering. Dr. Waltz, who has treated plaintiff since 1976, testified as to his objective medical findings, as well as to his expert medical opinion that plaintiff was genuinely suffering from disabling pain (Tr. 263–64). Dr. Waltz testified that he had considered the possibility that plaintiff was faking, but had rejected that contention (Tr. 263–64). Plaintiff's assertions of pain are nowhere disputed or contradicted in the record. The record reveals no indication that any of the doctors who treated or examined plaintiff found his reports of pain to be in any way not credible or exaggerated.

Plaintiff has clearly established his inability to perform his former work. Plaintiff could not, as of November 13, 1975, and cannot now, return to his job as a meatpacker, nor could he work as an auto mechanic. Dr. Guttmann, who examined plaintiff at the request of the Social Security Administration, found that plaintiff was disabled from performing the type of work he had done in the past. Dr. Guttmann felt that plaintiff would be able to return to his previous work provided he received proper treatment and therapy, and should be re-evaluated at a later date to determine how much he had progressed (Tr. 207). There is no indication in the record that plaintiff was later re-examined by Dr. Guttmann or found able to work. There is thus no support in the record for the finding of the Social Security Administration that plaintiff is not disabled. Dr. Guttmann is the only one of the medical experts whose opinion even suggests that plaintiff, although disabled at the time of examination, might be able to work again at some time in the future. Yet, Dr. Guttmann did not later examine plaintiff again, and all subsequent medical evaluations by Dr. Waltz and Dr. Stein continue to attest to plaintiff's disability.

■ To the extent that there are any contradictions between the findings and opinions of Dr. Guttmann, who examined plaintiff on only one occasion, and Drs. Stein and Waltz, who each independently treated plaintiff on a continuing basis over a period of years, this Court chooses to rely on the testimony and reports of Drs. Stein and Waltz. The opinion of a treating physician is to be accorded greater weight than that of a doctor who has seen a claimant but once. *Smith v. Secretary of Health, Education and Welfare*, C.A. No. 79–816 (E.D.Pa. June 9, 1980); *Rosa v. Weinberger*, 381 F.Supp. 377, 380 (E.D.N.Y.1974).

The Social Security Administration has failed to show that plaintiff is capable of performing alternate gainful employment. Although the disability examiner found in August, 1977 that plaintiff was capable of certain light sedentary jobs such as car

rental clerk, assignment clerk, or meat grader (Tr. 210), the record reveals no evidence to support that decision, or that plaintiff would be able to engage in any other type of work. Indeed, plaintiff in fact attempted to engage in as light a type of work as can be imagined when he was employed as a telephone researcher, but was fired as his physical condition prevented him from even sitting at a desk and speaking on the phone.

The Social Security Administration can point to nothing in the record to contradict the findings of Mr. Orr, the sole vocational expert to have examined and reported on plaintiff's vocational capabilities. Mr. Orr, the vocational expert, determined that plaintiff is completely and totally incapable of sustained job effort and is totally unemployable in any job whatsoever (Tr. 286–87). Moreover, Mr. Orr clearly stated that plaintiff would be unlikely to obtain employment without concealing his condition, and if he did find a job, he would be incapable of performing his duties (Tr. 286–87). Mr. Orr's report was not available to the Administrative Law Judge, but was considered by the Appeals Council, which affirmed the Administrative Law Judge and rejected plaintiff's request for review of the hearing decision (Tr. 5–7). The Appeals Council believed that Mr. Orr's conclusions were not supported by the record, nor were they determinative of the issue of disability (Tr. 6). This court finds that Mr. Orr's report is absolutely consistent with the medical data and opinions in the record. The medical, vocational, and other information in the record lead a reasonable mind to the conclusion that the plaintiff is disabled and has been since November 13, 1975. While we must disregard any consideration of whether plaintiff, despite his medical condition, would be hired if he applied for work, the conclusion is inescapable that Mr. Orr correctly determined that plaintiff would be unable to hold any job, no matter how light, which he might be able to obtain.

We find that the plaintiff is entitled to a period of disability and disability benefits beginning November 13, 1975.