Thomas E. DePAEPE, Sr., Plaintiff-
Appellant,

v.

Elliot L. RICHARDSON, Secretary,
Health, Education and Welfare,
Defendant-Appellee.

No. 71–1706.

United States Court of Appeals,
Fifth Circuit.

July 14, 1972.

Walter D. Snider, Evans J. Karpenko, Hurst, Tex., for plaintiff-appellant.

Eldon B. Mahon, U. S. Atty., William L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., for defendant-appellee.

Before DYER, Circuit Judge, SKELTON, Judge,* and INGRAHAM, Circuit Judge.

SKELTON, Judge:

This is an appeal by Thomas E. De-Paepe, Sr., from a decision of the United States District Court for the Northern District of Texas, affirming the decision of the Secretary of Health, Education, and Welfare, denying appellant's claim for disability benefits under Sections 216 and 223 of the Social Security Act, 42 U.S.C. §§ 416, 423. The Secretary's decision affirmed a decision of a hearing examiner, made after a hearing in which appellant participated in person and by counsel. The decision of the examiner became the decision of the Secretary.

We reverse the judgment because the hearing examiner's decision is not supported by substantial evidence, and for other reasons set forth below.

The appellant was wounded in Korea in 1950 while serving in the United States Army. He was hit in the head and both arms and back and neck by shrapnel at that time. His injuries included a fracture at the base of his skull (right parietal-occipital region), a compound fracture of the right upper arm, and shell fragment penetrations in the left shoulder and upper arm. He had to undergo two operations for debridement of the skull wound. He suffered from a bone infection, and was required to have plastic surgery on the skull (cranioplasty of the right parietal bone) in October of 1951. These operations resulted in several metallic sutures and three metallic clips remaining in the skull. Also, a number of small metallic foreign bodies remained in the right shoulder. These and other injuries will be shown in more detail below. Appellant's army service terminated in 1957.

The appellant began to have dizzy spells, severe headaches and periods of blackout in 1961 which continued to 1967 and subsequent to that date. He had partial paralysis of his left leg, was exceedingly nervous, and had to take sodium dilantin and phenobarbital daily. These injuries and resulting pain, nervousness, mental anxiety, dizzy and blackout spells made it impossible for him to obtain and retain gainful employment that he was capable of performing.

In 1964, appellant filed a claim for disability insurance benefits under the Social Security Act for disability beginning November 10, 1964, stating that the disability was due to a head injury and residuals of shrapnel wounds in arms and legs. This claim was denied and appellant did not appeal. That claim is not involved here.

The present claim was filed on March 15, 1967, in which appellant stated he became disabled on November 7, 1964, due to a head injury. The claim was denied and judgment entered for the Secretary, as stated above, after the hearing examiner rendered a decision that appellant

* Hon. Byron G. Skelton, U. S. Court of Claims, sitting by designation.

was not under a disability as defined in the Act, starting on or before December 31, 1965, when he last had the necessary disability insured status.

■ The burden was on the appellant to establish that he was disabled within the meaning of the Act prior to December 31, 1965, the date he last met the insured status requirements of the Act. Dillingham v. Cohen, 5 Cir. 1968, 403 F.2d 213; and Seals v. Gardner, 5 Cir. 1966, 356 F.2d 503.

Section 223 of the Social Security Act (42 U.S.C. § 423 (1970)), defines disability as follows:

(d) Same; disability.

(1) The term "disability" means—

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; * * *

(2) For purposes of paragraph (1) (A)—

(A) an individual * * * shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

(B) * * *

(3) For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

■ We must now examine the evidence to determine whether or not appellant met the requirements of the Act. The Fourth Circuit Court of Appeals stated in Underwood v. Ribicoff, 298 F. 2d 850 (1962); and Dillon v. Celebrezze, 345 F.2d 753 (1965) that there are four elements of proof to be considered in determining whether a claimant is disabled within the meaning of the Social Security Act, and these are: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by his wife, other members of his family, his neighbors and others who have observed him; and (4) the claimant's age, education and work history. A fair and conscientious consideration of all of these elements of proof should furnish an examiner with a comprehensive and adequate method of determining whether or not a claimant is disabled within the meaning of the Act in most cases, including the one before us. It is obvious that *all* of these elements of proof must be considered together and in combination with each other, and not just one or two with the others excluded. Applying these principles to the instant case, the following facts appear:

(1) *Objective medical facts or clinical findings:*

The objective clinical findings and medical facts must be subdivided into medically determined *physical* ailments on the one hand and medically determined *mental* impairments on the other. The evidence as to objective physical ailments show: brain disease, skull defect, residuals of shell fragment wound with post operative scar, encephalopathy, traumatic, secondary to depressed compound fracture of right parietal skull

bone manifested by spastic paresis of left leg, partial paralysis of left leg which causes it to give out, motor weakness on left side of his body, residuals of shell fragment wound of right shoulder and arm with fracture of right humerus and retained multiple foreign bodies, shrapnel and metallic sutures and clips in his skull underlying a 4.5 x 2.5 cm. surgical defect in the right parietal occipital region, and metallic foreign bodies in his neck and right shoulder, shrapnel injuries to left shoulder, fracture, depressed, skull and fracture, compound, causing chronic osteomyelitis of the skull which required craniotomy and cranioplasty, parietal bone, right, with bone from a bone bank. The brain disease due to trauma was manifested by exaggeration of tendon reflexes in the left upper extremity and sensory disturbance in the lower extremity. A number of large metallic fragments were noted in the soft tissues in the region of the left glenohumeral joint and another metallic fragment was noted in the lateral soft tissue of the arm and also many small metallic fragments were noted in the delatoid region of the right arm. Some of these ailments may appear to be repetitious, but they have been listed from the evidence to give as complete a picture as possible.

The medically determined objective mental ailments include: anxiety reaction with depressive features, chronic, repressed hostility with tense, apprehensive and defensive attitude, inadequacy of personality with an associated tendency toward passive dependent behavior patterns, paranoid resentment over his injuries, extreme nervous condition which was intensified by economic stress and burdens.

It is true that the objective findings of the various doctors who examined appellant were somewhat different, but as in *Dillon, supra,* all of the doctors found the claimant was suffering from ailments of one kind or another as shown below.

(2) *Diagnoses of examining physicians:*

The first doctor to make a diagnosis of appellant's condition was Dr. Charles O. Joest, a captain in the army who reported on May 28, 1954, that appellant was unfit for return to full duty. His further diagnosis was as follows:

He has the following defects which require special consideration in his assignment Shrapnel wound of skull. Paralysis of left side of body with spasticity.

In view of the above, he is considered unfit for the following types of duty (state briefly in non-technical language the type of activity for which he is not fit): No combat what-so-ever. No Physical Training. No marching, climbing or carrying heavy weights.

Any limitation mentioned above are considered (permanent).

Dr. Eric Oppenheimer's diagnosis on January 2, 1958, was:

DIAGNOSIS:

Residuals, encephalopathy, traumatic, secondary to a depressed compound fracture of the right parietal skull bone, with history of osteomyelitis and cranioplasty for repair of small skull defect manifested by mild spastic paresis, left leg, and occasional headaches, and sensation of dizziness.

COMPETENCY:

Veteran is competent.

X-rays of the skull done this day reveal a 5 cm. skull defect partially filled with bone graft.

Dr. John O'Connor's diagnosis on January 2, 1958, stated:

DIAGNOSIS:

1. History of depressed, compound fracture of the parietal-occipital area, healed, with residual scar and with no apparent bony defect.

2. History of incomplete, compound fracture of the right humerus, healed, retained F. B's.

3. Multiple well healed, non-adherent scars, both arms, with no demonstrable loss of muscle tissue.

4. Deferred for X-ray studies. Osteomyelitis not found.

On October 18, 1960, Dr. F. D. Leahy of the Veterans Administration made the following diagnosis:

Our records show that the veteran is service-connected for skull defect, residuals of shell fragment wound with post-operative scar; encephalopathy, traumatic, secondary to depressed compound fragment of right parietal skull bone manifested by mild spastic paresis, left leg and occasional headaches and sensation of dizziness; residuals of shell fragment wound right shoulder and arm with fracture of right humerus and retained multiple foreign bodies; residuals of shell fragment wound of left shoulder and arm with retained multiple foreign bodies.

Dr. Eric Oppenheimer made a second diagnosis on May 2, 1961, as follows:

DIAGNOSIS:

1. Encephalopathy, traumatic, residuals of, mild, secondary to depressed compound fracture of the right parietal skull bone, with cranioplasty for repair of small skull defect manifested by hyperreflexia and minimal spasticity, left leg and occasional headaches and intolerance to heat and liquor.

Dr. K. H. Moody diagnosed appellant's condition on May 2, 1961, as follows:

DIAGNOSIS:

1. Residuals of shell fragment wound with depressed compound fracture right parietal bone healed with bone graft.

2. Residuals of perforating shell fragment wound right shoulder with incomplete compound fracture right humerus healed with retained metallic foreign bodies.

3. Scars of shell fragment wound left shoulder and scapular region healed with retained metallic foreign bodies.

Dr. R. J. McDonald diagnosed appellant's condition as shown by X-ray pictures on December 9, 1964, as follows:

SKULL SERIES, CHEST AND RIGHT SHOULDER

FINDINGS: Skull—There is a 4.5 x 2.5 cm. surgical defect in the right parietal occipital region with several metallic sutures and three metallic clips underlying the defect. Otherwise, the inner and outer tables are intact. The sella [?] is unremarkable. The pinsal is not visualized. Petrous ridges are intact. The paranasal and mastoid sinuses are clear.

IMPRESSION: Postoperative skull.

Right shoulder—A few small metallic foreign bodies are seen to lie about the proximal end of the humerus. No osseous or soft tissue abnormalities are noted.

Chest—No osseous abnormalities are noted. The lung fields are clear bilaterally. The cardiac silhouette is unremarkable and there is no evidence of active picural or paranchymal disease.

Dr. Lewis C. Overholt's diagnosis of December 9, 1964, stated:

*Diagnoses—*

1. Brain disease, due to trauma, chronic manifested by exaggeration of tendon reflexes in left upper extremity, absent left abdominal reflexes hypoactive left cremasteric reflex, hyperactive patellar and Achilles reflexes, inconsistent ankle clonus on the left, motor weakness and sensory disturbance in left lower extremity; recurrent headache, dizzy spells with occasional "blacking out" and emotional liability.

2. Anxiety reaction with depressive features, chronic, moderately severe secondary to DX #1.

3. Skull defect, by x-ray.

4. Retained metallic foreign bodies proximal end of right humerus, by x-ray.

Dr. R. E. H. Duisberg, a neurologist and psychiatrist made a psychiatric examination of appellant on October 28, 1965. His report is the most favorable to the examiner's decision that appear in the record. However, even his report shows appellant had physical and mental ailments. His diagnosis stated:

It is our opinion that the patient has a mild leftsided hemiplegia of upper motor neuron type, due to a head injury and skull defect. There is a reactive depression of mild degree. Associated with the depression, there is a mild degree of inadequacy of personality, with an associated tendency toward passive-dependent behavior patterns (augmented by a mildly paranoid resentment over being impaired by his injury).

Dr. Nilas M. Wilson, a medical rating specialist of the Veterans Administration, joined by two other VA rating specialists, diagnosed appellant's condition on February 20, 1958, and rated him 70 percent disabled at that time. This diagnosis was as follows:

Facts:

Service department clinical records in file reveal that veteran sustained multiple shrapnel wounds penetrating right occipital parietal area, as well as right and left shoulders and upper arms, resulting in fracture, depressed, skull and fracture, compound, incomplete of right upper humerus, causing osteomyelitis, chronic, skull and necessitating craniotomy and cranioplasty, parietal bone, right, with bone from bone bank. Veteran also incurred and was treated for malaria. On cited VA examination x-ray of skull shows that there is a defect in the right parietal bone, adjacent to the sagittal suture, which measures approximately 5-cms. in diameter and is partially filled with a bone graft. The number of metallic clips, dural clips, are noted within the defect and the small metallic fragment is noted in the sub-tissues of the neck anterior to C–2. Neurological examination also shows that veteran has a mild spastic paresis of the left leg, result of original brain injury with scar in the dura. Veteran also complains of occasional headaches and the sensation of dizziness. A number of large metallic fragments are noted in the soft tissues in region of the left glenohumeral joint and another metallic fragment is noted in the lateral soft tissue of the arm and also many small metallic fragments are noted in the deltoid region of the right arm. The resulting SFW of both shoulders and arms are adequately described.

On January 19, 1965, Dr. C. B. Neidhamer, a medical rating specialist of the VA, joined by two other VA rating specialists, diagnosed appellant's condition and rated him "Individual unemployability (100%) from 11–12–64." This diagnosis stated:

On current examination the skull defect which has previously been described was noted. He has brain disease due to trauma manifested by exaggeration of tendon reflexes in the left upper extremity and sensory disturbance in the lower extremity; recurrent headaches, dizziness. There was considerable repressed hostility, he was tense, apprehensive, defensive, guarded in his attitude, was having difficulty in accepting and adjusting to his residual disability especially since he has been unable to work and support his family.

(3) *Subjective evidence of pain and disability as testified to by plaintiff and corroborating witnesses:*

The plaintiff testified at the hearing and described his pain and disability. He said that he began to have dizzy spells in 1961 when working as a guard in a civil service job. At that time he blacked out and fell off a stool to the floor. He left that job because of this experience and got another civil service job where the same kind of dizzy spells and blackouts occurred and he had to leave. He had the same experience in still a third civil service job. Then he got a job in the Denver Mint in 1964 as a janitor where he had to quit because of such dizziness and blackout

spells. He testified his legs would give out on him and he would fall and because of this he could not walk up a flight of stairs or work on a ladder or do other janitor work. He had five severe blackout spells between 1961 and 1967 and during one of them he demolished a car he was driving. He suffered from constant headaches and could not control his left leg because of paralysis on his left side caused by the shrapnel wounds. He has been taking phenobarbital for his headaches and sodium dilantin to control the blackout spells since they were prescribed for him by doctors in 1963. They are prescription medicines and each are taken three times each day. He said he was extremely nervous and jumpy. He has not been able to do any work since 1964 except a few chores in and around his house. He testified that when he had worked and the pressure of his job built up, he would get violently sick and could not eat or sleep, would get very nervous with headaches and dizzy spells, and would have to quit. When his left leg starts bothering him he gets sick at his stomach. He has dizzy spells often during which he sees stars, gets light headed and falls to the floor.

Appellant's wife testified about his subjective pain and disability. Her testimony was generally as follows. He has had brain surgery three times. His condition got worse after 1960. She has seen him have many dizzy spells and blackouts. In describing them she said he would fall to his knees and then to the floor and pass out for up to one hour, during which time she would wash his face with cold water. He had such spells almost daily, but sometimes they were worse than at other times. She has seen him go as long as two to four weeks with a headache, during which time he could not stand noise nor the sound of a television, and would complain of dizziness. He cannot do much standing or walking because his legs give out on him and he gets sick at his stomach. He cannot bend or stoop over without falling, as he gets dizzy and loses his balance. He is very nervous and will jump when the telephone rings or a door or window slams. She has on occasions returned home and found him lying on the floor. Even if he is not unconscious, he has no control of himself when he falls to the floor. This condition existed before December 31, 1965, and has continued to the present time.

Appellant's foreman at the United States Mint in Colorado corroborated appellant's testimony by furnishing a written statement in which he stated appellant had suffered several dizzy spells in his presence and his legs gave out on him causing him to lose control of his body and because of this he was unable to do his work as a laborer-cleaner.

A Mr. Louis H. Fuller, Sr., a fellow-employee, furnished an affidavit that he had witnessed appellant having several dizzy spells when his legs would give out on him causing him to fall without being able to control himself. On these occasions, he would bruise his head and body. Because of this he was unable to do his work and could not be left alone for any period of time.

(4) *The claimant's age, education, and work history:*

The facts show that appellant was born September 14, 1929, and was approximately 36 years of age on December 31, 1965. His schooling was limited to an 8th grade education. He is not trained nor skilled in any particular field. After he was discharged from the army, he engaged principally in three occupations, namely, cab driver, security guard, and janitor. The evidence shows he tried each of these jobs, some of them more than once, and was unable to perform them because of his ailments. He was driving a car on one occasion and demolished it when he had a dizzy and blackout spell. As pointed out above, he tried to work as a guard for the civil service on three different occasions (at Seal Beach Ammunition Depot, North Island Naval Air Station, and Rock Island Arsenal), between 1961 and 1964, and had to quit each time because of dizziness and blackout spells and his left

leg giving out on him. Finally, he got a job as a janitor at the U. S. Mint in Colorado in 1964 where he worked for 10 months. He said most of the employees were disabled veterans and they sort of carried him along as to his work and looked after him, but his ailments finally got so bad he had to quit. This is shown by the statements of his foreman and fellow-employee described above.

Appellant has worked on a job only one day since 1964, and that was in 1965 when he worked for a termite exterminating company. He became violently ill from bending and stooping and could not continue the work. However, he has tried to get employment at General Electric Computer, Philco-Ford in California, and Scientific Data System, but all of them turned him down because of his disability. He moved to Texas in 1969.

The opinion of the examiner discusses some of the non-medical evidence as well as some of the medical evidence, but in his evaluation of the evidence he places full reliance only on the medical evidence and mainly on the objective medical evidence. In this connection, he stated:

> * * * [I]t [disability] must be established from *medical evidence*, and where necessary, *by appropriate medical* tests, * * *
>
> * * * [T]he impairment alleged *must be medically determinable.*
>
> \* \* \* \* \* \*
>
> * * * [H]is impairments, as disclosed by the *medical evidence*, did not reach a pinnacle of severity as to constitute a disability within the meaning of the * * * Act * * *. [Emphasis supplied.]

The examiner's findings reveal the same basic misunderstanding of the law, as shown by the following:

> \* \* \* \* \* \*
>
> 4. During the pertinent period involved claimant had the following *medically determinable* physical impairments: (1) Skull defect, by x-ray. (2) Retained metallic foreign bodies, proximal end of right humerus, by x-ray.
>
> 5. During the pertinent period involved claimant had the following *medically determinable* mental impairment: Anxiety reaction with depressive features. [Emphasis supplied.]

There were no other findings as to injuries, impairments, or disabilities.

Finally the examiner found: ·

> 7. Claimant had the physical and mental capacities to engage in substantial gainful activity during the period of time involved and was able to perform the duties of a security guard, a taxicab driver, and a custodian, occupations in which he had previously been employed.

These findings show that the examiner gave no consideration whatever to the subjective evidence of pain and disability as testified to by the plaintiff and corroborated by his wife and other witnesses. He considered only some of the objective medical facts, principally those shown by x-ray, and not even all of those were considered. He disregarded the symptomology of the appellant. This was error. In Bittel v. Richardson, 3 Cir. 1971, 441 F.2d 1193, the court said:

> The Act and the regulations [20 C.F.R. § 404.1502(a)] promulgated by the Secretary pursuant to it *require a subjective determination* of the claimed disability. Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability * * *. [Cases omitted.] [Emphasis supplied.] [Id. at 1195.]
>
> * * * Thus,· Congress chose not to limit to laboratory techniques and evaluations the kind of evidence which may support a claim of disability, but instead adopted a broader standard encompassing all medical techniques. And as was stated in Ber v. Celebrezze, *supra*, 332 F.2d [293] at 299 [2 Cir. 1964]: " * * * even pain unaccompanied by objectively observable

**100**

symptoms which is nevertheless real to the sufferer and so intense as to be disabling will support a claim for disability benefits." [Id. at 1195.]

This court held in Dillon v. Celebrezze, *supra*, that "clinical medical reports are not necessarily dispositive of the question of a claimant's disability," citing Underwood v. Ribicoff, *supra*, and pointed out that subjective evidence of the pain and disability of the claimant is one of the elements of proving entitlement to disability benefits under the Act. *See also* Polly v. Gardner, 6 Cir. 1966, 364 F.2d 969; Butler v. Flemming, 5 Cir. 1961, 288 F.2d 591; and Ross v. Gardner, 6 Cir. 1966, 365 F.2d 554.

Actually, the objective medical findings of physical and mental ailments in the instant case, when considered as a whole, do not support the findings of the examiner, and such findings are not supported by substantial evidence.

Furthermore, it appears that the examiner did not consider all of the various diagnoses of the examining physicians, as set forth in detail above, in making his findings.[1]

The finding of the examiner that appellant was able to perform the duties of security guard, a taxicab driver, and custodian (janitor) was clearly erroneous. Not only did the medical evidence and the appellant's subjective evidence of pain and disability, as corroborated, show this not to be true, but also his work history proved that although he had tried to do work of this kind, he was unable to do so. He had wrecked one car because of a blackout spell while driving it. One could hardly imagine a more hazardous situation for appellant as well as for passengers and the public than one where he drives a cab. No cab company would hire him knowing he has blackout spells, and it would be foolhardy for him to operate his own cab. The finding of the examiner in this regard is clearly not supported by substantial evidence.

In like manner, the evidence showed that appellant had tried to be a security guard at three different government installations and was forced to quit each time because of dizzy and blackout spells. The Secretary had the names of these agencies where he worked, but made no effort to disprove appellant's testimony. His work history in this regard, plus the medical evidence and subjective symptoms of appellant showed clearly he could not be a guard.

The evidence is likewise clear that appellant could not do janitor work. He tried it at the U. S. Mint and failed. He could not bend or stoop over, nor walk long distances. His left leg would give way and he would fall with a blackout spell. All of this is fully corroborated by his foreman and another fellow-employee.

Accordingly, we conclude that the finding of the examiner and the decision of the Secretary that appellant could drive a cab, work as a security guard, and as a janitor is not supported by substantial evidence.[2]

■ Under these circumstances, the burden shifted to the Secretary to show that there is available some other kind of "substantial gainful employment" ap-

1. See footnote 2, post.

2. In fairness to the examiner, it should be pointed out that the following evidence was not before the examiner: (1) V.A. diagnosis and 70 percent disability rating of 1958; (2) V.A. diagnosis and 100 percent disability rating of 1965; (3) affidavit of appellant's foreman at U.S. Mint in Colorado; (4) statement of fellow-employee Louis H. Fuller, Sr.; (5) examination and diagnosis report of Dr. Lewis C. Overholt; (6) examination and diagnosis report of Dr. Eric Oppenheimer (1958); (7) examination and diagnosis report of Dr. Oppenheimer (1961); (8) report of examination and diagnosis of Dr. K. H. Moody; and (9) report of examination and diagnosis of Dr. John O'Connor. However, all of this evidence was before the Appeals Council, whose decision was adverse to appellant and its decision became that of the Secretary.

pellant is able to perform. *See* Garrett v. Finch, 6 Cir. 1970, 436 F.2d 15, 18, and many cases there cited. The Secretary did not choose to do so.

■ The examiner did not give any consideration in his findings to the fact that the VA had rated appellant as 100 percent unemployable although he did mention it in evaluating the evidence. While such a rating is not binding on the Secretary, it is evidence that should be considered and it is entitled to great weight. *See* Pulaski v. Finch, 3 Cir. 1969, 415 F.2d 613.

■ The cases are numerous that hold that the Social Security Act should be liberally construed in favor of disability and the intent is inclusion rather than exclusion. *See* Polly v. Gardner, *supra*, and cases cited therein. This is particularly applicable in the case before us where the evidence shows that the claimant received serious wounds and injuries in combat while fighting in Korea in the military service of our Country. Should there be any doubt as to his disability, it should be resolved in his favor.

However, we have concluded that the overwhelming weight of the medical, physical, and mental evidence, the medical diagnoses, the subjective evidence of pain and disability as corroborated by the claimant's wife and fellow-employees and the work history of the claimant, show that appellant is disabled within the meaning of the Act and is entitled to the disability benefits claimed. We further conclude that the adverse decisions of the examiner and Secretary are not supported by substantial evidence.

The judgment of the district court is, accordingly, reversed with instructions to enter judgment for the appellant and to remand the case to the Secretary of Health, Education and Welfare with directions to grant appellant the disability insurance benefits claimed.

Reversed.