Charles **DURHAM**, Plaintiff,

v.

Kenneth S. **APFEL**, Social Security Commissioner, Defendant.

No. Civ.A. 1:97CV2061RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 22, 1998.

Charles Lee Martin, Office of Charles L. Martin, Decatur, GA, for Charles Durham, plaintiff.

Jane Wilcox Swift, Lori M. Beranek, Office of United States Attorney, Atlanta, GA, for Kenneth S. Apfel, Commissioner of SS, defendant.

## *ORDER*

STORY, District Judge.

This case is before the Court for consideration of the Report and Recommendation [11–1] by Magistrate Judge Joel M. Feldman recommending that the Commissioner's decision be remanded for further consideration. After carefully considering the Report and Recommendation, the Court receives it with approval and adopts it as the opinion and order of this Court.

Accordingly, the Commissioner's decision is **REMANDED** for further consideration consistent with the Report and Recommendation.

*ORDER FOR SERVICE OF REPORT
AND RECOMMENDATION*

FELDMAN, United States Magistrate Judge.

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Local Rules LR 72 and LCrR 58. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay,* 714 F.2d 1093 (11th Cir.1983), *cert. denied* 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

IT IS SO ORDERED.

*MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION*

This is an action to review the determination by the Secretary of Health and Human Services ("the Secretary") that Charles Durham is not entitled to a Period of Disability, Disability Insurance Benefits and Supplemental Security Income under §§ 216(i), and 223(a) of the Social Security Act, 42 U.S.C. §§ 416(i), 423(a), 1381a and 1382.

## I. PROCEEDINGS BELOW.

Charles Durham filed a claim for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income on August 8, 1993 (TR 56–59, 80–83) alleging that he had been disabled due to a back and foot impairment and brain damage since July 21, 1993 (TR 56). His applications were denied initially (TR 69–70, 84–86), and on reconsideration (TR 78–79, 87–88). A hearing was held, and a decision was issued denying his claim (TR 10–26). The claimant requested a review of the hearing decision (TR 7), and the Appeals Council denied the claimant's request (TR 3–4), so the decision of the ALJ is the final decision of the Commissioner. Claimant brought this action in the district court for review of the final decision.

Mr. Durham has filed all appeals, including this action, in a timely manner, and this matter is properly before the U.S. Magistrate Judge.

## II. ISSUES

The plaintiff raised two issues on this appeal:

**A. WHETHER THE ALJ'S FINDING THAT THE PLAINTIFF DOES NOT MEET LISTING § 12.05C WAS BASED ON INCORRECT LEGAL STANDARDS**

**B. WHETHER THE ALJ FAILED TO CONSIDER ALL OF THE PLAINTIFF'S IMPAIRMENTS**

## III. STANDARD FOR REVIEW

A claimant for disability benefits under the Social Security Act bears the initial burden of demonstrating that he is unable to return to any past relevant work due to a medically determinable impairment. Once he has done so, the burden shifts to the Secretary to prove that the claimant can, in spite of his impairments, perform other work which constitutes substantial gainful activity. *Freeman v. Schweiker,* 681 F.2d 727 (11th Cir.1982).

The Administrative Law Judge has the exclusive power to resolve conflicts in the evidence. *Arnold v. Heckler,* 732 F.2d 881 (11th Cir.1984). But he must state the weight accorded to each item of evidence, and the reason for his conclusion. *Hudson v. Heckler,* 755 F.2d 781 (11th Cir.1985). The scope of judicial review is limited to deter-

mining whether the findings of the Secretary are supported by substantial evidence taking the record as a whole. *Tieniber v. Heckler,* 720 F.2d 1251 (11th Cir.1983). Substantial evidence has been defined as "more than a scintilla ... it means such relevant evidence as the reasonable mind might accept as adequate to support a proposition." *Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982). This court must examine the record as a whole, however, and may not affirm the Secretary's decision by referring only to those parts of the record which support the same. *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir.1983). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456, 467 (1951) (Frankfurter, J.). The Secretary's conclusions must also be reasonable. *Powell on Behalf of Powell v. Heckler,* 773 F.2d 1572 (11th Cir.1985).

■ To be supported by substantial evidence, the court must also be satisfied that the decision of the Secretary is grounded in the proper application of the appropriate legal standards. *Bridges v. Bowen,* 815 F.2d 622 (11th Cir.1987). There is neither a presumption that the legal standard applied by the Secretary is valid, nor that it was properly applied. *Lamb v. Bowen,* 847 F.2d 698, 702 (11th Cir.1988).

■ "[T]here are four elements of proof to be considered in determining whether a claimant is disabled within the meaning of the Social Security Act, and these are: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by his wife, other members of his family, his neighbors and others who have observed him; and (4) the claimant's age, education and work history. A fair and conscientious consideration of all of these elements of proof should furnish an examiner with a comprehensive and adequate method of determining whether or not a claimant is disabled within the meaning of the Act in most cases, including the one before us. It is obvious that all of these elements of proof must be considered together and in combination with each other, and not just one or two with the others

excluded." *DePaepe v. Richardson,* 464 F.2d 92 (5th Cir.1972). A decision based on a Vocational Expert's response to a hypothetical ignoring one of these factors is not based on substantial evidence. *Freeman v. Schweiker,* 681 F.2d 727 (11th Cir.1982).

The proper procedure for evaluating a disability claim under the Social Security Act is a five-step process, often called the sequential evaluation process. Under the sequential evaluation process, the Administration must first decide if the claimant is working. If so, the claim is denied and the evaluation stops. If the claimant is not working, it then decides if she has a severe impairment. If not, the claim is denied and the evaluation stops. Thirdly, it decides whether the impairment meets or equals an impairment described in the listings of impairments. If so, the claim is granted. Otherwise, the evaluation continues. The fourth step concerns whether the claimant can return to any past relevant work. If so, the claim is denied and the evaluation stops. At the fifth and final step the Administration decides whether there is any other work the claimant can do. 20 C.F.R. § 416.920. At the fifth step, the Administration may apply the rules in the Grid (20 C.F.R. Regulations No. 4, Subpart P, Appendix 2) to determine whether there are jobs the claimant can perform, provided that the Grid rule takes into account all the claimant's limitations. 20 C.F.R. § 416.969.

In the instant case, the ALJ decided the claim adversely to the claimant at the fourth step, concluding that Mr. Durham was capable of performing his past work as a kitchen helper (TR 17).

## IV. EVALUATION OF THE EVIDENCE

### A. OBJECTIVE MEDICAL EVIDENCE

Mr. Durham has a history of treatment for back pain. Georgia Baptist Medical Center on October 19, 1992, saw him with complaints of back pain. "Examination reveals some tenderness on his left buttock and left lower back." (TR 147). Lumbosacral and pelvic x-rays were essentially normal with "some evi-

dence of degenerative joint disease" in the lumbar spine (TR 147, 149).

Mr. Durham was examined by Dr. Shure on November 19, 1992, with complaints of back pain radiating into the left leg. Dr. Shure noted, "He moved about with some degree of care and caution and very definitely did appear to be in discomfort." (TR 156). The exam revealed "tenderness in the lower lumbar area with spasm and restriction of movement. The straight leg raising test on the left was markedly positive with a positive Lasegue test. The bowstring test was positive. Patrick's test was positive on the left." (TR 156). The left ankle reflex was slightly decreased. Dr. Shure stated, "this patient has an acuted [sic] left lumbar radiculopathy. He very definitely does appear to be in discomfort." (TR 156). "He will be instructed to remain at home at restricted activity." (TR 156).

Mr. Durham underwent a lumbar MRI on November 23, 1992, which showed "loss of signal intensity of the L2–3 and the L3–4 intervertebral discs consistent with degeneration," and "mild extradural defects noted at L2–3 and L3–4 consistent with osteophytic impingement." (TR 162). The impression was "[d]egenerative disc disease L2–3 and L3–4." (TR 162).

Mr. Durham underwent an L4–5 epidural steroid injection on December 10, 1992, at the Saint Joseph's Hospital Pain Control Center (TR 157, 160). The notes indicate that after a fall at work, Mr. Durham "developed pain in his lower back and neck, the next day. He also noted numbness and a progressive discomfort in the lateral aspect of his left leg." (TR 157). There was "good pain relief" following the injection (TR 159).

Notes from Dr. Shure dated December 14, 1992 indicate improvement in Mr. Durham's condition (TR 156, 163). The exam revealed "minimal lower lumbar tenderness." (TR 156).

Mr. Durham presented to the Saint Joseph's Hospital Pain Control Center on December 28, 1992, with complaints of recurrent low back and left leg pain after lifting a tire at work (TR 152, 154). The "examination is remarkable for paravertebral muscle [spasm] on the left, extending from approximately L1 through L5. There [is] tenderness to palpation over the spinous processes of L1–2, 3, 4, 5, particularly at 3 and 4. Straight leg raising is positive on the left at 30 degrees. Absent deep tendon reflexes at the knees." (TR 152–153). There is a question of "whether sustained flexion in the flexors of the left foot is somewhat diminished as compared to the right." (TR 153). "There has been no change in the patient's health since he was last seen." (TR 153). Mr. Durham underwent an epidural steroid injection at L3–4 on the left. Dr. Mcleod stated "I think this patient would benefit from activity restriction," and he is "advised to not do any lifting whatsoever for 2 weeks." (TR 153).

Notes from Dr. Shure from January 8, 1993 indicate the exam revealed lower lumbar tenderness. (TR 151). Notes from April 2, 1993 indicate Mr. Durham had a recurrence of his lumbosacral symptoms after lifting a tire. "Examination shows evidence of a lumbosacral strain." (TR 151).

Mr. Durham presented to Dr. Muller for a consultative psychological evaluation on October 22, 1993. The background indicates he has a fourth grade education. He stated that he suffered brain damage at age 14 due to a motor vehicle accident. Several years ago "[h]e began experiencing what he calls 'blackouts'. He does not lose consciousness but rather goes into a somewhat dizzy and woozy-like state." (TR 164). He "spends his typical day taking care of his mother and wife." (TR 165). "He describes his own sleep as 'real bad'. He claims that for the last four years he has been suffering a nerve problem which causes him difficulty sleeping. However, it was difficult to attribute this nerve problem to anything specific." (TR 165). Mr. Durham "describes his appetite as diminished." (TR 165). "[H]e can concentrate and attend to" a TV show (TR 165). "He is unable to read." (TR 165). "He did recall an arrest, although he had difficulty stating how long he was in prison or the exact charges." (TR 165).

Mr. Durham "showed some difficulty getting his ideas across." (TR 165). "There was no obsession or unsolicited reference to pain." (TR 165). "After a long pause, he denied that he is suicidal, although it appears he has considered such action but was unwill-

ing to admit it." (TR 165). "His affect is diminished and he tended to relate with a restricted range of emotion and in a fairly serious and somber manner. He alleged to have been depressed for approximately the last three years." (TR 165). "His cognitive functions appeared slightly impaired." (TR 165). "He has some difficulty with long-term recall . . ." (TR 166).

Testing revealed a verbal IQ of 68, performance IQ of 70 and full scale IQ of 68. "The obtained results are a valid estimate of Mr. Durham's actual IQ." (TR 166). Reading and math skills were both below 3rd grade level. The Benton Visual Motor Retention test "suggests a mild impairment in visual memory." (TR 166). "Mr. Durham is currently functioning in the Mild Range of Mental Retardation, is functionally illiterate, and shows symptoms of an atypical depressive disorder." (TR 166). "The prognosis for a successful rehabilitation is poor." (TR 167). Dr. Muller suggests "early onset of senility or an associated condition such as high blood pressure" as possible explanations for the Mr. Durham's blackouts (TR 167). Dr. Muller's diagnoses were atypical depression and mild mental retardation (TR 166).

Mr. Durham presented to Grady Memorial Hospital on November 10, 1993 with complaints of back pain. Exam revealed tenderness in the lumbosacral spine. The assessment was low back pain syndrome (TR 171). Mr. Durham presented on November 19, 1993 for follow up of back and neck pain. He reported that his back felt better, but his neck pain had worsened. The exam showed tenderness over the cervical-spine (TR 168). Cervical x-rays from November 29, 1993 showed "fairly severe degenerative disc disease from C3–1 with narrowing and osteophytes at multiple levels. There is some uncal vertebral osteophytosis but minimal foraminal impingement is visible. There is also some facet joint involvement." (TR 169).

Notes from Dr. Shure dated November 16, 1994, indicate Mr. Durham had been receiving treatment at Grady Memorial Hospital, but "apparently owed them some money and he is no longer able to get any treatment. He has continuing problems in the back which will awaken him at night. He also has some intermittent symptoms in the left lower

extremity." (TR 176). The exam revealed "some tenderness in the lower lumbar area." (TR 176). "X-rays were obtained showing some evidence of narrowing at L3–4." (TR 176). Dr. Shure stated, "I feel he is capable of working." (TR 176).

Dr. Ginn, a non-examining physician employed by the government, reviewed the psychological evidence and noted the presence of "[s]ignificantly subaverage intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period." (TR 130). Dr. Ginn indicates Mr. Durham would often experience "Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner" (TR 133).

## B. SUBJECTIVE EVIDENCE

Mr. Durham suffers from degenerative disc disease of the lumbar and cervical spines (TR 149, 162, 169, 176), depression and mental retardation (TR 166).

He can lift two or three pounds on a regular basis, stand for thirty or forty minutes, sit for one hour, and he has trouble bending and kneeling (TR 43–44).

## C. AGE, EDUCATION AND WORK EXPERIENCE

At the time of the June 20, 1995 hearing, Mr. Durham was 59 years old (TR 34). He completed fourth grade (TR 38), but is illiterate (TR 165–66). Mr. Durham has past relevant work experience as a tire repairer, laborer, kitchen helper and material handler (TR 46).

## D. VOCATIONAL EVIDENCE

Mike Head, vocational expert, testified at the hearing that Mr. Durham's past work as a kitchen helper was medium and unskilled and his past work as a tire repairer, laborer and material handler was heavy and semi-skilled (TR 46). The VE testified that Mr. Durham has no transferable skills (TR 46).

The ALJ posed a hypothetical: "Assuming we have an individual the same age, same educational background, same past-relevant work, and if they had a medium residual functional capacity with some nonexertional limitations, the same as set forth at Exhibit 15, beginning on page 30, [TR 138–140], is a copy of a mental residual functional capacity assessment by Dr. Gim [sic]—" "... based on that hypothetical, could any of the claimant's past relevant work be viable for such an individual?" (TR 46–47). The VE testified that such an individual could perform Mr. Durham's past work as a kitchen helper, and could also work as a cafeteria attendant, driver/helper sales route and hand packager (TR 47–48).

The VE testified that if an individual "were unable to complete their work tasks in a timely fashion over a third of each workday," "[t]hen that would certainly, pose problems in a person continuing in employment. They would probably be able to obtain the position, but doubt that they would be able to maintain the position, given that hypothetical situation." (TR 48).

The VE testified that according to the *DOT*, all jobs require some level of literacy (TR 52). However, the VE opined, "Reality speaks differently, in terms of people who work in jobs where they do not have that type of ability." (TR 53).

## V. ANALYSIS

### A. THE ALJ DECISION

In his decision, the ALJ found that "[t]he medical evidence establishes that the claimant has back problem and mild mental retardation,[1] impairments which are 'severe' but which do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4., either singly or in combination." (TR 21). He found that "[t]he claimant's statements concerning his impairments and their impact on his ability to work are found to be credible only to the extent consistent with this decision." (TR 21). He concluded that Mr. Durham "has a residual functional capacity for medium work with the additional nonexertional limitations set forth by Dr. Ginn at Exhibit 15, pp. 30–32 [TR 138–140]," and that "[t]he claimant's past relevant work as a kitchen helper did not require the performance of work functions precluded by the limitations set forth in Finding No. 5 above." (TR 21).

### B. THE ALJ APPLIED IMPROPER LEGAL STANDARDS WHEN HE FOUND THAT THE PLAINTIFF DOES NOT MEET A LISTING

The ALJ found that "[t]he medical evidence establishes that the claimant has back problem and mild mental retardation, impairments which are 'severe' but which do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4., either singly or in combination." (TR 21). In his decision, he states, "Specifically, the claimant does not meet Listing 12.05 even though he recorded an IQ of 70 or below. Thus, the record does not establish that the claimant has fulfilled the condition precedent to Listing 12.05 which requires any subaverage general intellectual functioning to have manifested itself during the developmental period (before age 22)." (TR 17).

The ALJ's opinion appears to contradict the findings of the consulting and non-examining psychologists, although he adopted them in the decision. They both found that the claimant has mild mental retardation. As noted in the footnote, the diagnosis of mental retardation requires that the level of function be found to have begun before age 22.

■ The court has held that a claimant meets the mental retardation listing, 12.05C, when the following are shown: 1) a valid I.Q. score of 60 to 70 inclusive; and 2) a physical or other mental impairment imposing additional and significant work-related limitation of function. *Lowery v. Sullivan*, 979 F.2d 835 (11th Cir.1992). The requirement that

---

1. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (1994, American Psychiatric Association) (DSM–IV) states that the "essential feature of Mental Retardation is significantly subaverage general intellectual functioning", and that the "onset must occur before age 18 years". Id at 39. Mild mental retardation represents a level of intellectual function represented by a range of IQ scores from "50–55 to approximately 70". Id at 46.

mental retardation or low IQ began prior to age 22 is met when nothing in the record reflects an incident in which claimant suddenly became mentally retarded. *Gant v. Sullivan,* 773 F.Supp. 376, 382 (S.D.Fla. 1991); *Lowery v. Sullivan,* 979 F.2d 835 (11th Cir.1992).

■ The evidence of record shows that Dr. Muller's testing revealed a verbal IQ of 68, performance IQ of 70 and full scale IQ of 68. Dr. Muller stated, "The obtained results are a valid estimate of Mr. Durham's actual IQ." (TR 166). And, nowhere in his report does he suggest even the possibility that Mr. Durham once functioned at a higher level. Dr. Ginn noted specifically the presence of "[s]ignificantly subaverage intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period." (TR 130). The ALJ does not mention this evidence which contradicts his conclusion. The ALJ cannot act as both judge and physician. *Marbury v. Sullivan,* 957 F.2d 837, 840–41 (11th Cir.1992).

The ALJ states, "Moreover, the claimant's having only gone to the fourth grade is not proof that his IQ was 70 or below during the developmental period." (TR 17). Dr. Muller's testing revealed that Mr. Durham is functioning below the third grade level, and is functionally illiterate (TR 166). The ALJ does not mention this in his discussion of Listing 12.05, and fails to discuss what caused Mr. Durham's I.Q. to decline, as he must have believed, or what evidence supported the finding. Nor does the ALJ explain why Mr. Durham's educational achievement level would be below the third grade level if he completed the fourth grade and was not mildly retarded at the time.

The ALJ states, "In addition, the record does not establish that the claimant had deficits in adaptive behavior which were initially manifested during the developmental period as required by Listing 12.05." (TR 17). The ALJ goes on to state, "Indeed, the record establishes that the claimant has a long history of adaptive behavior. For example, Dr. Muller positively referred to the claimant's 40–plus years work history." (TR 17). Dr.

Muller's stated that Mr. Durham "did receive a blow to the head at age fourteen, however, he worked the subsequent 40–plus years without significant difficulties." (TR 167). This statement appears to have been that Mr. Durham's blackouts were not being caused by his old head injury, rather than any comment on the quality of his "adaptive behavior."

Mr. Durham's work history does not support the ALJ's implication that he successfully worked for 40 years. He had no earnings whatsoever in nine years between 1953 and 1991, and minimal earnings several other years (TR 101–102). Mr. Durham has worked primarily as a heavy laborer (TR 46). There is no evidence that these jobs are beyond the reach of a mildly retarded individual. The ALJ never asked the VE if Mr. Durham's work history was inconsistent with his low IQ.

The ALJ discusses "a pervasive developmental disorder characterized by significant communicative deficits originating in the developmental period as required by Listing 12.05." (TR 18). This clearly refers to the autism section of the Listings. This is clearly a mistaken reference to the wrong legal standard. Mr. Durham is not autistic, he is mentally retarded.

Plaintiff and the Commissioner agree that the ALJ must look outside the I.Q. test results themselves, and also consider the other evidence. *Popp v. Heckler,* 779 F.2d 1497, 1499–1500 (11th Cir.1986) (upholding finding that I.Q. testing results were not credible because they were in conflict with the fact that claimant had taught high school algebra, had almost obtained a B.S. degree, and because "there was good reason to believe that [he] exaggerated his problems"). Unlike Mr. Popp, Mr. Durham's work experience does not include technical jobs, but jobs as a laborer. He did not teach high school algebra, he worked as a tire repairer, laborer, kitchen helper and material handler (TR 46). Mr. Durham did not go to college, he went to the fourth grade. Achievement testing performed by Dr. Muller revealed that Mr. Durham's reading and math skills are below the third grade level (TR 166), and there is no evidence that Mr. Durham exaggerated his

problems. Dr. Muller noted, "There was no obsession or unsolicited reference to pain." (TR 165). Dr. Muller's opinion was that "[t]he obtained results are a valid estimate of Mr. Durham's actual IQ." (TR 166).

The ALJ suggests that Mr. Durham's activities of daily living prove he is not mentally retarded (TR 17). Mr. Durham reported his activities of daily living in great detail to Dr. Muller (TR 165). Dr. Muller would be expected to say so if he thought these activities were inconsistent with Mr. Durham's mental retardation, but he did not say so. The ALJ felt his unsupported opinion about mental retardation was entitled to more weight than the opinion of the examining psychologist. The Secretary's decision need not be supported by a preponderance of the evidence, but it cannot stand with a "mere scintilla of support." *Hillsman v. Bowen,* 804 F.2d 1179, 1181 (11th Cir.1986); *McRoberts v. Bowen,* 841 F.2d 1077, 1080 (11th Cir.1988).

A claimant meets the mental retardation listing, 12.05C, when he demonstrates: 1) a valid I.Q. score of 60 to 70 inclusive; and 2) a physical or other mental impairment imposing additional and significant work-related limitation of function. *Lowery v. Sullivan,* 979 F.2d 835 (11th Cir.1992). The requirement that mental retardation or low IQ began prior to age 22 is met when nothing in the record reflects an incident in which claimant suddenly became mentally retarded. *Gant v. Sullivan,* 773 F.Supp. 376, 382 (S.D.Fla.1991); *Lowery v. Sullivan,* 979 F.2d 835 (11th Cir.1992). In other words, the claimant is entitled to a presumption that his intellectual limitations began before age 22. Apparently the ALJ accepted the two psychologists' opinions that the limitation began before age 22, because he accepted the mild mental retardation diagnosis. Thus, the court concludes that the decision that Mr. Durham does not meet Listing 12.05c is unsupported by substantial evidence and is contrary to the legal standards prevailing in this circuit.

The ALJ concluded that Mr. Durham's past work suggested he does not meet Listing 12.05 C. A claimant who is not currently engaging in substantial gainful activity and who has a severe impairment which meets or equals a listing, is entitled to dis-

ability benefits. *Edwards v. Heckler,* 736 F.2d 625, 628 (11th Cir.1984). A claimant whose impairment meets a listing is disabled when not working, even if he or she worked in the past with the impairments, and even if he or she could return to his or her past work. *Ambers v. Heckler,* 736 F.2d 1467, 1469–70 (11th Cir.1984) (finding that a mentally retarded claimant who was gainfully employed in the past is disabled upon the cessation of employment). See also *Powell on Behalf of Powell v. Heckler,* 773 F.2d 1572, 1576 (11th Cir.1985). Listing 12.05 C anticipates in its definition that a person with an IQ of 60 to 70 may be able to work unless there is another impairment imposing additional work-related limitations. Mr. Durham attempted to work, though his success was sporadic, until he suffered a back injury. This is entirely consistent with Listing 12.05 C.

Reversal is warranted where the record is fully developed and, upon the application of the correct legal standards, the claimant is entitled to benefits. *Carnes v. Sullivan,* 936 F.2d 1215, 1219 (11th Cir.1991). Reversal is required where entitlement is clear from the record. See, e.g., Edwards by *Edwards v. Heckler,* 755 F.2d 1513 (11th Cir.1985) (reversing without remand after finding ALJ erred in factual finding that claimant's impairment met a listing); *Edwards v. Heckler,* 736 F.2d 625 (11th Cir. 1984) (reversing where review of record showed plaintiff's mental retardation met a listing). Proper remedy where the ALJ fails to properly apply legal standards is reversal, not remand. *Lamb v. Bowen,* 847 F.2d 698, 701 (11th Cir.1988). *See also Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990); *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991).

## C. THE ALJ FAILED TO CONSIDER ALL OF THE PLAINTIFF'S IMPAIRMENTS

Where the ALJ fails to consider all of a claimant's impairments, his decision is not supported by substantial evidence. A court may reverse the Secretary's final decision when it is convinced that it is not supported by substantial evidence or that proper legal standards were not applied. *Carnes v.*

*Sullivan,* 936 F.2d 1215, 1218 (11th Cir.1991). The court is required to give deference to factual findings, with close scrutiny to questions of law. *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991). Substantial evidence is defined as "such relevant evidence as a reasonable person would accept as adequate to support a conclusion". *McRoberts v. Bowen,* 841 F.2d 1077, 1080 (11th Cir. 1988). The Secretary's "failure to provide the reviewing court with sufficient basis for a determination that proper legal principles have been followed mandates reversal." *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990); *Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991); *Gibson v. Heckler,* 779 F.2d 619, 622 (11th Cir.1986).

 In his decision, the ALJ states, "Although the claimant's attorney argued that there is a problem with regard to the claimant's cervical spine, the record does not establish such a disorder. Moreover, as of November 16, 1994, Mr. Durham's treating orthopedist, Dr. Shure, did not mention problems with regard to his cervical spine." (TR 19).

The report from Dr. Shure referred to by the ALJ did not state that any examination of Mr. Durham's cervical spine was performed (TR 176). Treatment records, including cervical x-rays, from Grady Memorial Hospital showed "fairly severe degenerative disc disease from C3–1 with narrowing and osteophytes at multiple levels. There is some uncal vertebral osteophytosis but minimal foraminal impingement is visible. There is also some facet joint involvement." (TR 169).

 The evidence of this severe degenerative arthritis of the cervical spine clearly required consideration and, perhaps, further development. A consultative evaluation would have been useful to determine the functional limitations associated with Mr. Durham's cervical impairment. The ALJ has a basic duty to fully and fairly develop the record. *Cowart v. Schweiker,* 662 F.2d 731, 735–36 (11th Cir.1981); *Smith v. Schweiker,* 677 F.2d 826, 829 (11th Cir.1982); *Nelms v. Bowen,* 803 F.2d 1164, 1165 (11th Cir.1986); *Welch v. Bowen,* 854 F.2d 436, 438 (11th Cir.1988). The Commissioner's duty to develop the record includes ordering a consultative examination if one is needed to make an informed decision. *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984) (failure to order such an evaluation is reversible error); *Holladay v. Bowen,* 848 F.2d 1206, 1209 (11th Cir.1988).

The ALJ is required to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments are disabling. *Walker v. Bowen,* 826 F.2d 996, 1001 (11th Cir.1987). The ALJ clearly failed to consider Mr. Durham's impairments in combination. Because the ALJ failed to include Mr. Durham's degenerative disc disease in his hypothetical question to the vocational expert, his decision in reliance on the answer to his question is unsupported by substantial evidence.

## VI. CONCLUSION

The decision whether to reverse the ALJ's decision or to remand for application of proper legal standards. While there appears little doubt that Listing 12.05c directs a finding of disabled, and the claimant's degenerative disc disease appears to constitute the required "other" impairment, the undersigned recommends that this case be remanded to the Commissioner for the application of the proper legal standards. This Court is troubled by the ALJ's finding that Mr. Durham could return to his past relevant work, as the commissioner appears to have concluded prior to the hearing decision that a return to his past work was beyond his physical capacity (TR 90–93), a finding which may well be binding on the ALJ.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision be REMANDED for further consideration consistent herewith.

IT IS SO RECOMMENDED.

November 10, 1998.